Filed 6/26/25  P. v. Palacios CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063294 |
| v. | (Super. Ct. No. SWF1301484) |
| ABRAM DANIEL PALACIOS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, John M. Monterosso, and Frederick Paul Dickerson III, Judges. Affirmed.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Evan Stele, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

A lying-in-wait special circumstance murder occurs when a defendant intentionally kills a victim by concealing his or her presence or purpose, by watching and waiting for an opportunity to act, and then by making a surprise attack from a position of advantage. (*People v. Stevens* (2007) 41 Cal.4th 182, 201–202 (*Stevens*); Pen. Code, § 190.2, subd. (a)(15).) [1]

Defendant Abram Daniel Palacios was a passenger in a car that his brother Juan Mejia was driving. They were looking for Ivan Carrillo, who was driving an SUV. Palacios suspected Carrillo of having been involved in a home invasion robbery of his home months earlier. As Carrillo was approaching an intersection, Mejia suddenly pulled in front of Carrillo's SUV and blocked it from moving forward. Palacios and Mejia got out of their car armed with guns. As Carrillo sat in his SUV with his hands up, Palacios and Mejia fired multiple shots at the SUV. Carrillo died at the scene.

A jury found Palacios guilty of first degree murder with a firearm, and found true a lying-in-wait special circumstance allegation. The trial court imposed a term of life without parole (LWOP), plus 20 years.

In this appeal, Palacios claims: there is insufficient evidence to support the jury's true finding as to the lying-in-wait special circumstance; the trial court erred by refusing to instruct the jury on voluntary manslaughter as a lesser included offense; the court abused its discretion by allowing the People to impeach a defense witness (Mejia) with some of his prior felony convictions; the court erred by not conducting an in camera review of an officer's personnel records (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*)); and there was cumulative prejudice.

We find no errors and affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

2

# I.

## FACTS AND PROCEDURAL BACKGROUND

On June 6, 2013, in the late afternoon, Carrillo was visiting his girlfriend at her home, which was located on Las Rosas Drive, in a residential area of San Jacinto. Carrillo had parked his large Ford Excursion SUV on the street. Carrillo's last name was displayed on the back window of the SUV.

Palacios and his girlfriend, Jane Doe, lived together in San Jacinto. Doe had earlier spotted Carrillo's SUV. Someone called Doe and told her that the SUV was now parked on nearby Las Rosas Drive. Doe then called Palacios because she was scared. Doe and Palacios both suspected Carrillo "had something to do with a [prior] home invasion" robbery of another home they lived in, which occurred on October 31, 2012. In less than an hour, Palacios arrived at home, went to the bedroom, and retrieved a black handgun. Doe later went to the home of Palacios's sister, and his brother-in-law Emmanuel C. (Emmanuel).

Palacios was later outside of his home with his friend, Alfonso R. (Alfonso), and Emmanuel. Palacios and Emmanuel were discussing Carrillo's SUV. All three men left in Doe's car, a Honda Accord, to look for Carrillo. The men saw the distinctive SUV parked on Las Rosas, but they did not see Carrillo. Palacios asked someone working in a yard (perhaps a gardener) if that person had seen who was driving the SUV, but the person said he did not know. Palacios then dropped off Emmanuel at his home, and then returned to his own home with Alfonso.

When Palacios and Alfonso arrived back at Palacios's home, Palacios's brother Mejia was in the driveway. Palacios and Mejia spoke to each other. Alfonso left because the brothers "were upset and rowdy." The brothers then got into the Honda Accord and drove around the neighborhood.

3

Mejia was driving, and Palacios was in the passenger seat.

A woman was driving a vehicle on Las Rosas Drive approaching Osprey Street. At the intersection, there were two stop signs, which controlled traffic turning from Osprey Street onto Las Rosas Drive. As the woman drove with the right-of-way and approached the intersection, she saw an SUV driving towards her on Las Rosas Drive; the SUV was being driven by a man (Carrillo).

As the woman entered the intersection, she saw a Honda Accord darting out to her left from Osprey Street. The woman slammed on her brakes to avoid a collision. The Honda Accord came to a stop in front of Carrillo's SUV, which prevented him from moving forward. The woman saw two men (Mejia and Palacios) get out of the Honda Accord with guns in their hands. Both men fired their guns at the SUV after Carrillo put up his hands while sitting in the driver's seat. After making eye contact with the car's passenger (Palacios), the woman drove into a cul de sac and called 911.

*The Investigation*

Deputy sheriffs arrived on the scene within three minutes. One deputy saw bullet holes in the SUV and saw Carrillo's bloody body slumped over in the driver's seat. The deputy detected a faint pulse and shallow breathing, so he pulled Carrillo out of the SUV and onto the ground in order to facilitate first aid. Another deputy noticed the SUV's reverse lights were on, and there was music playing. After Carrillo was out of the SUV, the deputy placed it in park, and turned off the power. Carrillo was pronounced dead at the scene. An autopsy later revealed that Carrillo had died from multiple gunshot wounds.

Investigators retrieved 15 shell casings, and a later analysis

determined that 13 had been fired from one weapon, and two were fired from another. Investigators canvassed the neighborhood, finding videos showing the Honda Accord riding slowly around the neighborhood just prior to the shooting. The woman who had witnessed the shooting later identified Palacios from a photo lineup as the passenger in the Honda Accord. Police searched for Palacios and Mejia, but they fled to Mexico after the shooting.

About two years later, Mejia was arrested and brought back to the United States. A jury convicted Mejia of murder with a firearm enhancement. The jury also found true a lying-in-wait special circumstance.

*Court Proceedings*

About 10 years after the shooting, Palacios was arrested and brought back to the United States. The People filed an information charging him with first degree murder. The People further alleged a personal use of a firearm enhancement and a lying-in-wait special circumstance enhancement.

Prior to trial, Palacios filed a *Pitchess* motion, seeking to discover an investigating officer's personnel records. The court denied the motion (the ruling will be covered in detail in the discussion section of this opinion).

During the trial, Palacios's girlfriend Jane Doe testified under a grant of immunity. Doe said that when the shooting occurred, she heard gunshots in the distance. On a cell phone, Palacios spoke to Doe and said, "I got him. I got him." Palacios later told Doe that he had looked for Carrillo's SUV and "they found it, but Ivan wasn't there, and came back home. And then, they left again to go look for the Excursion." Palacios told Doe that when they found Carrillo, he and Mejia both got out of the car at the same time, and that he started shooting first. For several days after the shooting, Doe and Palacios stayed away from San Jacinto. Doe assisted Palacios and

5

Mejia by helping to hide her Honda Accord, which was eventually located by the police at her mother's home in Los Angeles.

Palacios called Mejia as a defense witness. Prior to his testimony, the trial court ruled that some of Mejia's prior felony convictions could be used for impeachment (the evidentiary ruling will be covered in detail in the discussion section of this opinion).

Mejia testified that he and Palacios were driving slowly through the neighborhood looking for Carrillo before the shooting. Mejia said Palacios was driving. Mejia testified that when they spotted Carrillo, Palacios did not block his SUV. Mejia testified that he got out of the car first, waited five seconds, and then fired his weapon at Carrillo until he ran out of bullets. Mejia said that "before I shot him the first time, he kept saying, 'I'm sorry, I'm sorry.'" Mejia testified that after Carrillo made a gang sign, he went back to the car, got a second weapon, and again fired at Carrillo "to stop the monster he was." Mejia said he did not tell Palacios in advance what he was going to do, and that Palacios stood by the door and looked surprised during the shooting. Mejia testified there were no other cars nearby.

The jury found Palacios guilty of the charged crimes, and found true the sentencing enhancements. The trial court imposed a sentence of LWOP, plus a determinate term of 20 years.

## II.

## DISCUSSION

Palacios claims: A) there is insufficient evidence to support the lying-in-wait special circumstance enhancement; B) the court erred by not instructing the jury on a lesser offense; C) the court erred by allowing Mejia to be impeached with his prior convictions; D) the court erred by denying a

6

*Pitchess* motion; and E) cumulative prejudice.

## A. Lying-In-Wait Special Circumstance

Palacios claims the jury's true finding on the lying-in-wait special circumstance enhancement is not supported by substantial evidence and therefore "must be reversed." We disagree. We find that there is evidence to support each element of the lying-in-wait special circumstance.

In this part of the discussion, we will: 1) consider the standard of review; 2) discuss the elements of the lying-in-wait special circumstance; and 3) analyze the elements of the rule as applied to the facts.

### 1. Standard of Review

"When considering a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact *could* find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27, italics added.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"The reviewing court presumes in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*Ibid*.)

## 2. The Elements of Lying in Wait

The elements of lying in wait are: 1) "a physical concealment or concealment of purpose"; 2) "a substantial period of watching and waiting for an opportune time to act"; and 3) "immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*Stevens, supra*, 41 Cal.4th at pp. 201–202; *People v. Gurule* (2002) 28 Cal.4th 557, 630.)

The three lying-in-wait elements can support a lying-in-wait special circumstance allegation as well as a lying-in-wait theory of first degree murder (distinct from premeditation and deliberation). (§§ 189, subd. (a), 190.2, subd. (a)(15).) The only difference is that the special circumstance finding "requires the specific intent to kill, whereas first degree murder by lying in wait does not."[2] (*People v. Superior Court* (*Bradway*) (2003) 105 Cal.App.4th 297, 309–310.)

The first element is "a physical concealment or concealment of purpose." (*Stevens, supra*, 41 Cal.4th at p. 201.) "The concealment required for lying in wait 'is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.] It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.'" (*People v. Webster* (1991) 54 Cal.3d 411, 448.) "'The concealment can be accomplished by ambush or some other secret plan.'" (*People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1264.)

The second element requires "a substantial period of watching

---

[2] Palacios does not dispute there was substantial evidence he intended to kill Carrillo, so the intent element is not at issue.

8

and waiting for an opportune time to act." (*Stevens, supra*, 41 Cal.4th at p. 201.) The California Supreme Court has "never placed a fixed time limit" on the required "substantial" period of watching and waiting. (*People v. Moon* (2005) 37 Cal.4th 1, 23.) "Indeed, the opposite is true, for we have previously explained that '[t]he precise period of time is . . . not critical.'" (*Ibid.*) "Even accepting defendant's testimony that he waited only a few scant minutes before killing [the murder victim], a few minutes can suffice." (*Ibid.*) The purpose of the "'substantial' period" requirement "'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse.'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073.)

The third element requires that after the period of watching and waiting, there must be a surprise attack from a position of advantage that occurs "'immediately thereafter.'" (*People v. Michaels* (2002) 28 Cal.4th 486, 516 [effective March 8, 2000, the electorate "passed an initiative measure that . . . amended [section 190.2,] subdivision (a)(15) by changing '*while*' lying in wait to '*by means of*' lying in wait"].) The requirement of a surprise attack immediately *after* the period of watching and waiting ensures that the murder was committed under the current "'by means of' lying in wait" rule, rather than the former "'while lying in wait'" rule.[3] (*Id.* at pp. 516–517.) The California Supreme Court has explained that so "long as the murder is immediately preceded by lying in wait, the defendant need not strike at the

---

[3] The trial court appears to have mistakenly instructed the jury using the language of the former "while lying in wait" instruction (CALCRIM No. 727), rather than the current "by means of lying in wait" instruction (CALCRIM No. 728). The Attorney General argues that "this Court need only find that substantial evidence in the record supports a true finding based on the current standard, i.e. 'by means of' lying in wait." We agree. Palacios does not appear to dispute this point, and he has not challenged the trial court's lying-in-wait jury instruction in this appeal.

9

first available opportunity, but may wait to maximize his position of advantage before taking the victim by surprise.'" (*Id.* at p. 517.)

### 3. Application and Analysis

As far as the first element, the jury could have reasonably determined there was a concealment of purpose or presence. Palacios and his brother Mejia were looking for Carrillo prior to the shooting, and there was no evidence that Carrillo was aware of this fact. According to testimonial evidence, Palacios did not tell his friend Alfonso or his girlfriend Doe that his *purpose* in looking for Carrillo was to shoot and kill him. Additionally, there is evidence that Palacios and Mejia may have concealed their *presence* from Carrillo by waiting at the stop sign in the Honda Accord, and then darting onto Las Rosas Road just as Carrillo entered the intersection. (See *People v. Maldonado, supra,* 87 Cal.App.5th at p. 1264 ["'The concealment can be accomplished by ambush'"].)

As far as the second element, the jury could have reasonably determined that Palacios waited and watched for Carrillo for a substantial period of time prior to the shooting. The evidence showed that Palacios suspected that Carrillo had previously robbed him, Palacios and Mejia became aware that Carrillo's SUV was nearby, and the video evidence showed that the two brothers then drove slowly around the neighborhood in the Honda Accord looking for Carrillo. (*People v. Moon, supra,* 37 Cal.4th at p. 23 [under this element, even "a few scant minutes" of watching and waiting "can suffice" to establish a substantial period of time].)

As far as the third element, the jury could have reasonably determined that immediately after they watched and waited for Carrillo at the intersection, Palacios and Mejia then launched a surprise attack on him

10

from a position of advantage. That is, by darting out in front of Carrillo's SUV and stopping directly in front of Carrillo, he could not move forward. Then, as described by the eyewitness, Palacios and Mejia almost immediately got out of Doe's Honda Accord and started firing multiple times at Carrillo as he held up his hands while he was behind the steering wheel of the SUV. In other words, this crime appears to be a classic ambush by fire.

In short, we find that the three challenged elements of lying in wait are amply supported by substantial evidence. Thus, we affirm the jury's true finding on the lying-in-wait special circumstance allegation. [4]

Palacios argues "there was no evidence of a concealed purpose; there was no secret that Palacios and Mejia were out in their Honda looking for Carrillo. At one point, they saw a gardener in the neighborhood, and Palacios stopped the car and asked the gardener if he knew who was driving the Excursion; the gardener said he did not know. [Citation.] The two brothers continued to drive around the neighborhood searching for Carrillo; there was no evidence presented to show they attempted to hide or conceal themselves. Indeed, the evidence showed the opposite – they were openly searching for Carrillo."

But Palacios's argument misses the mark. While it may be true that Palacios and Mejia "were openly searching for Carrillo," Palacios did not disclose to the gardener (or his friend Alfonso) that *his true intention and purpose* was evidently to shoot and kill Carrillo. (See *People v. Webster,*

---

[4] The trial court also instructed the jury on the lying-in-wait elements as an alternative theory of first degree murder (distinct from premeditation and deliberation). (§ 189, subd. (a).) However, in this appeal, Palacios only challenges the lying-in-wait elements as they relate to the jury's special circumstance finding.

11

*supra,* 54 Cal.3d at p. 448 ["'It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct'"].) Indeed, had Palacios not concealed his apparent true intention and purpose, then perhaps someone may have alerted Carrillo (or perhaps law enforcement) to the danger, and the resulting special circumstances murder may have been averted.

Palacios cites several cases concerning the concealment element in which the defendant actively used false pretenses, or some kind of ruse, to lure a murder victim into a position of vulnerability. (See, e.g., *People v. Jurado* (2006) 38 Cal.4th 72, 119 [male defendant lured female murder victim into car, which provided opportunity for ambush]; see also *People v. Sims* (1993) 5 Cal.4th 405, 433 [defendant lured pizza delivery driver into hotel room prior to strangling him].) Palacios then argues that the facts of this case are distinguishable from those cited cases.

But the problem with Palacios's argument is that the cited cases do not stand for the proposition that the prosecution was required to prove that he used false pretenses, or some kind of ruse, in order to establish the concealment element of a lying-in-wait special circumstance murder. Indeed, case law holds otherwise. (See *People v. Bonilla* (2007) 41 Cal.4th 313, 333 [the prosecution satisfies the concealment element by proving that the defendant concealed his purpose *or his presence*]; see also *People v. Maldonado*, *supra*, 87 Cal.App.5th at p. 1264 ["'The concealment can be accomplished *by ambush* or some other secret plan'"], italics added.)

Palacios also argues "there was no substantial evidence that there was a period of watching and waiting before the brothers acted." Palacios asserts "there was no evidence that the Honda stopped at any intersection waiting for Carrillo to pass; indeed, the evidence contradicted any finding of watching and waiting."

12

We disagree. Based on the videos obtained by the investigating officers, there was evidence that Palacios and Mejia were slowly driving through the neighborhood immediately prior to the shooting. (*People v. Moon, supra,* 37 Cal.4th at p. 23 [there is no "fixed time limit" on the required "substantial" period of "watching and waiting"]. And based on the eyewitness' testimony, the Honda Accord darted out in front of Carrillo's SUV and blocked his escape immediately after he entered the intersection. Indeed, the eyewitness testified that she had to slam on her brakes to avoid colliding with the Honda Accord. Based on this evidence, it would have been reasonable for the jury to infer that Palacios and Mejia had stopped their car at the stop sign on Osprey Street, and then watched and waited for Carrillo to pass on the intersecting Las Rosas Drive, before they darted forward, forcing Carrillo to stop in the intersection. (See *People v. Grant* (2020) 57 Cal.App.5th 323, 330 ["'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence'"].)

Palacios argues that the case of *People v. Nelson* (2016) 1 Cal.5th 513 (*Nelson*), compels a different result. We disagree.

In *Nelson*, "[t]he evidence showed, directly or by reasonable inference, that Nelson rode his bicycle to the area near the Target parking lot, where he had reason to believe the victims would be waiting to go to work. He concealed his bicycle and came up behind his victims on foot to take them by surprise. He shot the two victims in quick succession. After ensuring his victims were dead by shooting a second time, he retrieved his bicycle and left." (*Nelson, supra,* 1 Cal.5th at p. 551.) The Supreme Court found there was insufficient evidence to prove the lying-in-wait special circumstance because there was no evidence "that Nelson arrived before the victims or waited in ambush for their arrival. In the absence of such evidence, there is

13

no factual basis for an inference that before approaching the victims, he had concealed his bicycle and waited for a time when they would be vulnerable to surprise attack." (*Ibid.*)

In this case, the evidence reasonably showed that Palacios was told by Doe that Carrillo was in his neighborhood, so he returned home to get his gun in order to kill him. After driving around with Emmanuel and Alfonso, and determining that Carrillo's SUV was parked on a nearby street, Palacios then met up with his brother Mejia, and they slowly drove around the neighborhood in Doe's Honda Accord, intending to find Carrillo in his SUV. And unlike *Nelson*, there is a reasonable inference—based on all of the preceding evidence—that Palacios and Mejia then arrived at the intersection before waiting and watching for the opportunity to ambush Carrillo. [5]

To reiterate and conclude, we find there is substantial evidence Palacios intentionally killed Carrillo, he concealed his presence or purpose, he watched and waited for an opportunity to act, and then he and Mejia made a surprise attack from a position of advantage.

*B. Voluntary Manslaughter*

Palacios claims the trial court erred by failing to instruct the jury on voluntary manslaughter as a lesser included offense. We disagree. There is not substantial evidence to support the instruction.

We review instructional error claims under an independent or de

_____

[5] The only other explanation would appear to be that Mejia and Palacios fortuitously came upon Carrillo at precisely the same time Carrillo was entering the intersection. But this was ultimately a decision for the jury to make. (See *People v. Meneses* (2019) 41 Cal.App.5th 63, 71 ["'the jury may reject impossible or unreasonable interpretations of the evidence'"].)

14

novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

In this part of the discussion, we shall: 1) review general principles of law regarding voluntary manslaughter; 2) summarize the trial court's ruling; and 3) apply the law to the facts.

*1. General Legal Principles*

The voluntary manslaughter statute refers to a killing "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) Another type of voluntary manslaughter occurs when a defendant kills in imperfect (unreasonable) self-defense. (*People v. Barton* (1995) 12 Cal.4th 186, 199.)

Under the heat of passion theory, the victim must provoke the defendant to such a degree that the provocation "would cause an emotion so intense that an ordinary person would simply *react,* without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.)

The heat of passion theory has both subjective and objective elements: *the defendant* actually killed in the heat of passion (the subjective element); and the provocation by the victim would arouse passion in the mind of an *ordinarily reasonable person* in similar circumstances (the objective element). (*People v. Steele* (2002) 27 Cal.4th 1230, 1253.) Under the objective element of the heat of passion theory, the "'defendant is not permitted to set up his own standard of conduct.'" (*Id.* at p. 1254.)

"To satisfy this test, the victim must taunt the defendant or otherwise initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) Further, the killing must have occurred suddenly in direct response to the provocation from the victim and not belatedly as revenge or punishment.

15

(*People v. Hach* (2009) 176 Cal.App.4th 1450, 1458.) That is, if sufficient time elapsed for the passions of a reasonable person to cool, then the intentional killing was murder, not manslaughter. (*Ibid.*)

"Thus, to warrant instructions on provocation and heat of passion, there must be substantial evidence in the trial record to support a finding that, at the time of the killing, defendant's reason was (1) actually obscured as a result of a strong passion; (2) the passion was provoked by the victim's conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection." (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481.)

A trial court has a duty to instruct on a lesser included offense where there is substantial evidence to support the instruction. (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643.) However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 ["such instructions are [only] required whenever [the] evidence . . . is 'substantial enough to merit consideration' by the jury"].)

### 2. The Trial Court's Ruling

Prior to closing arguments, the trial court conducted a hearing to finalize the jury instructions. At the close of the hearing, Palacios's counsel said, "I would request, just for the record, voluntary manslaughter as well." When the court asked counsel for the basis of the request, he responded, "Based on the anger that was possessed pretty quickly -- just based on the evidence that we heard at the trial. I'll just submit based on that. I think the Court has already kind of ruled on it, but I'll ask for it just in case."

The prosecutor responded, "I don't think that there was any evidence that this was done in a heat of passion situation or imperfect self-defense situation. All the evidence -- we didn't get, I believe, any evidence to say that the defendant was acting in the heat of passion, or whether he was -- believed that he had should some right to imperfect self-defense. It seems, from all the evidence, that they knew Ivan Carrillo's car was in the area, they went looking for him, and found him, and shot him."

The court ruled, as follows:

"I agree. There was no evidence presented at the trial that he was acting under the heat of passion, or that it was imperfect self-defense. Mr. Mejia testified, in fact, that he was the one actually that shot the victim. And that the defendant, Mr. Palacios, . . . did nothing, other than was getting out of the car and standing up. And I think -- in fact, I'm certain the testimony was that [Mejia] fired all the bullets and that the defendant looked surprised while he did it, not angry at all. It was just very surprised that it happened.

"Other than that, they pursued . . . the victim, not the other way around. And whatever had happened, there was no evidence to substantiate there was ever any kind of home invasion robbery or when it happened. So there was a lag between the occurrence of the alleged home invasion robbery and when this occurred. [¶] The victim['s car] was at someone's house. They drive by the car, and they lie in wait. And the testimony, I believe, they executed him. Unless they believe, now, Mr. Mejia, and that maybe he was acting under heat of passion. Although, yeah, it didn't come out what he was convicted of -- but that wouldn't have anything to do with the defendant. That [Mejia] said I was angry, I got out, I shot him. He threw up gang signs, so I shot him some more. But that has nothing to do with Mr. Palacios.

"So, in the opinion of the Court, there is no evidence to support

17

giving any lessers here -- manslaughter, whether it's heat of passion, or imperfect self-defense. All the evidence was the victim was in the car, defenseless, and they shot in the windshield of his car. So I agree with the People here. That should not be given."

### 3. Application and Analysis

In short, we agree with the analysis of the trial court. We find there is not substantial evidence in the record to support the giving of a voluntary manslaughter instruction as a lesser included offense to the charged crime of first degree murder.

As far as the imperfect self-defense theory of voluntary manslaughter, there was no evidence that Palacios was in imminent danger of being killed. As the trial court observed, the most favorable view of the evidence was that Carrillo was shot in his SUV by Mejia as he held up his hands, and possibly said, "I'm sorry, I'm sorry." (See *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306 ["the defendant must have believed 'the *immediate* use of deadly force was necessary to defend against' the danger"].)

As far as the heat of passion theory, there was no evidence Carrillo had any interaction with Palacios or Mejia immediately prior to the killing other than perhaps saying he was sorry. That is, there was no evidence of any of provocation by Carrillo. (*People v. Carasi, supra,* 44 Cal.4th at p. 1306 ["the victim must taunt the defendant or otherwise initiate the provocation"].) Moreover, there was no evidence that Palacios was intentionally seeking to kill Carrillo during a period of intense emotion as a result of the provocation. (See *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708 ["To establish voluntary manslaughter under a heat of passion theory, both provocation and heat of passion must be found"].)

18

Palacios claims that he was emotional because of Carrillo's alleged involvement in an armed robbery of his home. But according to Doe, the alleged robbery occurred on October 31, 2012, so as the trial court observed, there was a considerable lag time between the alleged fear and the shooting that occurred on June 6, 2013. (See *People v. Hach, supra,* 176 Cal.App.4th at p. 1458 [if sufficient time elapsed for the passions of a reasonable person to cool, then the killing was murder, not manslaughter].)

Palacios further argues the "evidence supports the possibility that the killing occurred in a heat of passion, as this was the first possible sighting by [Palacio and Mejia] of Carrillo after the terrifying home invasion robbery." But under well-established law, the defense of voluntary manslaughter cannot be used as an excuse for revenge. (See *People v. Hach, supra,* 176 Cal.App.4th at p. 1458 [the killing must have occurred ""suddenly as a response to the provocation, and not belatedly as revenge or punishment"""]; see also *People v. Steele, supra,* 27 Cal.4th at p. 1254 [under the objective element of the heat of passion theory, the "'defendant is not permitted to set up his own standard of conduct'"].)

To reiterate and conclude, we find that the trial court did not commit an instructional error by failing to instruct the jury on the crime of voluntary manslaughter (imperfect self-defense or heat of passion).

## C. Prior Convictions for Impeachment

Palacios claims the trial court abused its discretion by allowing the People to impeach Mejia with some of his prior convictions. We disagree. Generally, witnesses may be impeached with prior felony convictions involving moral turpitude conduct, and there is no indication that the court's ruling was somehow arbitrary or capricious.

19

In this part of the discussion, we shall: 1) review general principles of law regarding the admission of prior convictions; 2) summarize the trial court's ruling; and 3) apply the law to the facts.

*1. General Legal Principles*

We review a trial court's ruling to admit or excluded impeachment evidence for abuse of discretion and will not disturb the ruling "unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

"A trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

"For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ." (Evid. Code, § 788.) In a criminal trial, ordinarily only felony convictions involving "moral turpitude" may be used for impeachment. (*People v. Rodriguez* (1986) 177 Cal.App.3d 174, 179.) Moral turpitude offenses are "crimes in which dishonesty is an element (i.e., fraud, perjury, etc.)." (*People v. Chavez* (2000) 84 Cal.App.4th 25, 28.)

Generally, "all relevant evidence is admissible." (Evid. Code, § 351.) Relevant evidence includes "evidence relevant to the credibility of a witness." (Evid. Code, § 210.) However, "[t]he court *in its discretion* may

20

exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, italics added.)

Under the abuse of discretion standard, a trial court's "'decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge."'" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 978.)

### 2. Trial Court Proceedings

Prior to Mejia testifying, the trial court conducted a brief hearing regarding the admissibility of his prior convictions. The prosecutor orally reviewed the convictions from Mejia's rap sheet. In 1998, there was a conviction for false imprisonment. In 2002, there were two convictions for rape by force, one conviction for assault with intent to commit rape, one conviction for illegal sex with a minor, and one conviction for residential burglary. In 2016, there was a conviction for murder with a firearm enhancement, and with a lying-in-wait enhancement. The prosecutor said that she did not want to bring in the 1998 conviction for false imprisonment, or the 2002 conviction for statutory rape, but she did want to impeach Mejia with the remainder of the crimes. The court clarified that the crimes were felonies involving moral turpitude conduct.

The trial court asked Palacios's counsel if he wished to be heard. Counsel said, "I believe all the 2002 things are sex charges. I think they're [a] totally . . . different class of crime. I believe it would be highly prejudicial because that just makes him out to be a bad guy. And I don't think it's

21

relevant for this. And it's also remote in time. [¶] Admittedly, he was in prison for a while, but he did discharge parole successfully. And he did not commit those, you know, further. So I would think that these are only going to be there to confuse the jury." As far as the murder conviction, counsel said, "I think it's just too prejudicial, especially since I'm going to elicit that, yeah, he fired guns and killed the guy. So I don't know that that should come in, the conviction part. The conduct is going to come in, obviously. I'm going to ask about it."

The trial court asked the prosecutor for a response. The prosecutor argued that Mejia's 2002 convictions were not remote in time. The prosecutor said that Mejia "was released on parole in 2009, and was discharged in 2012, and 9 months later, this murder happens." The prosecutor noted that as far as prejudice, the jury would be given a "limited purpose instruction, and I think that would take care of any concern." The prosecutor argued that the purpose of impeachment is for the jury to determine whether Mejia "is a credible person. So the fact that he is a convicted murderer, that is moral turpitude, and I should be able to impeach on that conviction. [¶] Additionally, I'm not asking to impeach on what we call the stat rape offenses. I'm asking to impeach on the rape with force or fear, which is a crime of violence. But I recognize that sex crimes are prejudicial, but that doesn't mean that . . . they're more prejudicial than they are probative when it comes to impeachment. [¶] And, obviously, this witness's testimony, his credibility is very important. And I think that the jurors should have a full picture of who this individual is, as far as credibility goes, and they can do with it what they wish."

The trial court then ruled on the admission of Mejia's prior convictions for impeachment purposes:

22

"I agree with the People . . . . They're not requesting the stat rape. They're requesting the rape being brought in. That is a crime of violence. This is a crime of violence -- different kinds of crimes of violence, but They're violent in nature. So they're not dissimilar in the sense they're violent crimes. [¶] As far as being remote in time, they're not. He was convicted on April 30th of 2002. He's in prison until 2009, then he's discharged in 2012 on parole. Then, literally nine months later, this is committed. So he's been in custody almost the entire time since 2002.

"The residential burglary . . . is a crime of moral turpitude. For the Court to exclude [the 2002 convictions] is to provide an inaccurate picture of [Mejia's] criminal history. The jury has the right to decide whether or not what he is saying is true. And without this information, it does provide an incomplete picture. It's probative because what he's saying is going to have some impact on the jury. They need to know what his history is so they can decide for themselves what they believe. [¶] As far as the homicide goes, yes, that's a crime of moral turpitude. He was convicted of it, and they shouldn't be confused. He's here. He's in a jail suit. They're going to wonder what happened. And a jury is presumed to follow the instructions. The instructions from the Court are going to be -- and I've already talked to them about this -- he's presumed innocent, and the People have to prove him guilty beyond a reasonable doubt. That has nothing to do with the witness. That has to do with your client. So it's completely different."

At the beginning of the People's cross-examination of Mejia, the prosecutor asked him to confirm the felony convictions that the trial court had ruled were admissible for impeachment purposes.

### 3. Application and Analysis

"Any testifying witness can be impeached with evidence that he or she suffered a prior conviction of a felony involving moral turpitude." (*People v. Burton* (2015) 243 Cal.App.4th 129, 133.) In this case, there is no dispute that Mejia's prior felony convictions, which the court admitted into evidence for impeachment purposes, all involved moral turpitude conduct.

"Exercises of discretion must be "'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.""" (*In re D.P.* (2023) 92 Cal.App.5th 1282, 1291.) Here, the trial court was conversant with the appropriate legal principles regarding the admission of prior felony convictions for purposes of impeachment. The court appeared to listen attentively to the summary of Mejia's prior felony convictions. Indeed, the court asked questions to clarify that the convictions were felonies that involved moral turpitude conduct.

The trial court further listened and considered the arguments of both sides, and the court additionally responded to each of defense counsel's arguments regarding potential prejudice. The court then finally announced its ruling regarding the probative value of Mejia's prior convictions, which appeared to be grounded in reasoned judgment. In other words, we find that the trial court did not abuse its discretion.

On appeal, Palacios essentially repeats the same arguments he made in the trial court. For instance, Palacios argues "the probative value of Mejia's prior convictions was slight." He argues the admission of Mejia's prior convictions "completely and prejudicially undermine[d] his testimony to Palacios's detriment." Finally, Palacios argues the admission of Mejia's murder conviction in particular "implicitly gave guidance to the Palacios's jury on how to convict him."

24

But Palacios appears to misapprehend the role of this court. That is, under an abuse of discretion standard of review, even if this court would have ruled differently, and excluded *all* of Mejia's prior felony convictions, that does not establish a prejudicial evidentiary error by the trial court. (See *People v. Superior Court (Alvarez)*, *supra*, 14 Cal.4th at p. 978 [a trial court's "'decision will not be reversed merely because reasonable people might disagree'"].) We are simply not ""'authorized nor warranted in substituting [our] judgment for the judgment of the trial judge.'"" (*Ibid.*)

To reiterate and conclude, Palacios does not argue in this appeal that rape by force, assault with intent to commit rape, residential burglary, and murder are not crimes involving moral turpitude. Thus, having found that the trial court was not arbitrary or capricious (i.e., the court did not abuse its discretion), we affirm the trial court's evidentiary rulings.

### D. Motion for In Camera Review of Officer's Personnel Records

Palacios claims that the trial court abused its discretion when it denied his *Pitchess* motion for an in camera review of an investigating officer's personnel records. We disagree. The motion did not present a plausible factual basis for conducting an in camera review.

A trial court's order on a *Pitchess* motion is reviewed for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039 [a court has broad discretion in ruling on a *Pitchess* motion, and its ruling will not be disturbed absent an abuse of that discretion].)

In this part of the discussion, we shall: 1) review general principles of law regarding *Pitchess* motions; 2) summarize the trial court proceedings; and 3) analyze the law as applied to the facts.

*1. General Legal Principles*

A defendant's motion to discover an officer's personnel file that purportedly contains information helpful to his or her defense, is commonly called a *Pitchess* motion. (*Pitchess*, *supra*, 11 Cal.3d. 531.) The Legislature has largely codified *Pitchess* procedures. (Evid. Code, §§ 1043–1047.) If a defendant establishes good cause, the trial court must screen the officer's personnel files for evidence that may be relevant to the defense. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1220.) "By providing that the trial court should conduct an in camera review, the Legislature balanced the accused's need for disclosure of relevant information with the law enforcement officer's legitimate expectation of privacy in his or her personnel records." (*Ibid.*)

A *Pitchess* motion "shall include all of the following: [¶] (1) Identification of the proceeding in which discovery or disclosure is sought, the party seeking discovery or disclosure, the peace or custodial officer whose records are sought, the governmental agency that has custody and control of the records, and the time and place at which the motion for discovery or disclosure shall be heard. [¶] (2) A description of the type of records or information sought. [¶] (3) Affidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records." (Evid. Code, § 1043, subd. (b).)

"There is a 'relatively low threshold' for establishing the good cause necessary to compel in camera review by the court." (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316 (*Thompson*).) To establish good cause, "defense counsel's declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges" and articulate how the

26

discovery sought might be admissible or lead to relevant evidence. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1024 (*Warrick*).)

The defense must present "a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents." (*Warrick, supra*, 35 Cal.4th at p. 1025.) "A scenario sufficient to establish a plausible factual foundation 'is one that *might or could have occurred.* Such a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges.'" (*Thompson, supra*, 141 Cal.App.4th at p. 1316.)

### 2. Trial Court Proceedings

Prior to trial, Palacios filed a *Pitchess* motion requesting an in camera review of: "Any investigations of misconduct or possible misconduct of" Investigator Martin Alfaro. Palacios stated, in part: "This is a case where the Investigator in question has intimidated witnesses to lie or 'tell him what he wants to hear,' has lied on the witness stand in a previous trial, and has threatened the defendant' s family with arrest, with no legal basis to do so. Declarations of a family member [Palacio's sister] is attached, along with court transcripts from the previous trial of the co-defendant in this case."

The declaration of Palacios's sister averred, in part, "I was contacted by Investigator Alfaro several times during the course of this case. He accused me of hiding the defendant and also accused me of knowing where the defendant was hiding. He also threatened me with arrest for simply refusing to talk to him."

Attached to the motion were portions of various transcripts from unidentified witnesses and undated proceedings. One such transcript appears to be from a cross-examination of Investigator Alfaro. Apparently, Mejia's

27

counsel asked Alfaro at his prior trial, "Okay. You at no time ever indicated to [Palacios's sister] anything about you wanting to arrest her?" Alfaro responded, "I don't recall. I left it open that this was still an active investigation and that she might possibly be arrested. And if she did harbor [Abram] Palacios, that she was going to get arrested."

The sheriff's department filed an opposition: "This motion . . . is made against [Investigator Alfaro], for unfortunately an unknown situation in what appears to be a 2013 Murder. However, like much of the Motion, this is all guess work since no police reports and/or any case background was provided." The opposition argued that "there is nothing in Defendant's motion to indicate why it is valid as . . . the supporting declaration does not establish the requisite good cause via a plausible factual foundation as to why it should be heard and considered." The opposition argued "there is no plausible factual scenario set forth as to any of the claims and charges against [Alfaro]. The defendant is missing, omitting and . . . skipping many things."

Palacios filed a reply, which included a supplemental 10-page police report written by Investigator Alfaro. The report concerns the investigation into Carrillo's murder. The reply stated, in relevant part, "The sheriff's department can't seem to figure out how the attached transcript is related to this case. . . . And if it would have simply asked Investigator Alfaro his involvement in the case, it could have easily determined that he was the lead investigator on the case and interviewed many of the witnesses in this case, including the fact that he re-interviewed some of the witnesses that his fellow deputies had already interviewed. [¶] In addition, the sheriff's counsel complaint that there is no police reports [(sic)] attached to the motion can be easily be clarified as the defendant is not alleging that the report is false per se, but the Investigator in question left out some details that should have

28

been included. Just to be safe, the defendant attaches Alfaro's supplemental report that shows he had his hand in virtually every witness in this case."

The trial court conducted a hearing. The court indicated it had read the *Pitchess* motion, the opposition, and the reply. Sheriff's counsel stated, "with all due respect to [Palacios's] counsel, a lot of the things that he says I can do, aren't required of me." Sheriff's counsel argued that based on "the four corners of the" motion, it was lacking details, the department was not required to conduct an internal investigation based on the *Pitchess* motion, and, "I don't believe a plausible factual scenario of anything has been established."

After hearing further argument, the trial court ruled on the motion. The court said that the threshold "is actually pretty low when it comes to whether or not an in-camera review should be conducted." The court said that "the bottom line is the defense must . . . present a plausible factual scenario as to why the potential records would be beneficial to the defense case." The court ruled: "This is one of those rare occasions where I would find the defendant did not meet that threshold."

The trial court further explained its ruling as follows:

"Number one the first scenario presented was that . . . Investigator Alfaro had committed perjury or lied or made misleading statements during the course of a prior jury trial related to the same case. And, to be frank, as I read the excerpts . . . from the transcript, I couldn't figure out, quite honestly, . . . what exactly you were getting at. [¶] I agree . . . that [the Pitchess motion] was jumbled, out of context, and it was almost impossible to decipher what exactly you were pointing to."

"Secondly, . . . it was argued that comments made by Investigator Alfaro to a witness, who I don't believe was even a percipient witness to the

29

alleged offense, may have somehow been intimidating by alerting that particular witness to the fact that if she or he were harboring a fugitive that they could be subject to prosecution. Interestingly, that's basically what the investigator testified to in the transcripts that were provided and that's basically what the witness said in the declaration; so there's no inconsistency there. So there's nothing about that, that even if there were records that somehow pertain to this in the personnel file that would assist in any material way in the defense of the case. [¶] So on those grounds alone, the defense has failed to meet the prima facie level necessary to show a plausible factual scenario for the in-camera review."

### 3. Application and Analysis

A *Pitchess* motion is properly denied if "it is not internally consistent *or complete.*" (*Thompson, supra,* 141 Cal.App.4th at p. 1317, italics added.) In *Thompson*, defendant was arrested for selling illegal narcotics to an undercover officer who was "part of the narcotics 'buy team' of the Los Angeles Police Department." (*Id.* at p. 1315.) Defendant filed a *Pitchess* motion seeking an in camera review of the personnel records and other documents of several "officers and detectives who were involved in the drug transaction." (*Id.* at pp. 1315–1316.) A declaration by defendant's counsel asserted: "The charges 'are a fabrication manufactured by the officers . . . .'" (*Id.* at 1317.) The trial court denied the motion, and the Court of Appeal affirmed, holding that "the trial court could reasonably conclude that [defendant] failed to show good cause for the requested discovery because he did not present a specific factual scenario that is plausible when read in light of the pertinent documents and undisputed circumstances." (*Id.* at p. 1316.)

The *Thompson* court held that defendant's *Pitchess* motion was

30

"insufficient because it is not internally consistent or complete. We do not reject [the declaration] because it lacked credibility, but because it does not present a factual account of the scope of the alleged police misconduct, and does not explain his own actions in a manner that adequately supports his defense." (*Thompson*, *supra*, 141 Cal.App.4th at p. 1317.) "Most importantly for the instant case, the defendant must "'establish a plausible factual foundation'" for its defense." (*Id.* at p. 1316.) "Counsel's declaration simply denied the elements of the offense charged." (*Id.* at p. 1317.)

In this case, similar to *Thompson*, we find that the trial court could reasonably conclude that Palacios failed to provide a plausible factual foundation for the in camera review of Investigator Alfaro's personnel records. As the trial court pointed out, counsel's declaration did not "suggest a plausible factual scenario that would lead to any assistance to the defense should records be disclosed if they exist." In our independent review of the *Pitchess* motion and the supporting documents, we agree with the trial court's assessment "that it was jumbled, out of context, and it was almost impossible to decipher what exactly [it was] pointing to." That is, Palacios's *Pitchess* motion is "not internally consistent *or complete*." (*Thompson*, *supra*, 141 Cal.App.4th at p. 1317, italics added.)

Presumably, Palacios's motion was contending that Investigator Alfaro had lied on the stand when he testified at Mejia's trial. But the declaration by Palacios's sister was essentially consistent with Alfaro's trial testimony. Most importantly, Palacios did not establish in the *Pitchess* motion how any of this would support his defense. It appears that Palacios's sister may have been suspected of harboring Palacios in the days after the shooting. But we fail to see how this is relevant to his defense: that he was an innocent bystander when Mejia shot and killed Carrillo.

31

Palacios argues in this appeal that the declaration by his sister "satisfied the low threshold for good cause as it illustrated how the detective treated potential witnesses, threatening them to get the answers he wanted." Palacios goes on to argue: "These observations created good cause *for the court to investigate further* any other potential mistreatment of witnesses by investigator Alfaro, particularly as he was the person who conducted the unrecorded photo lineup with the main witness in the trial . . . to identify the driver and passenger of the Honda . . . ."

To begin with, we fail to see how the trial court had an obligation to conduct any kind of investigation. Further, the problem with this factual argument, and other factual arguments that Palacios raises in this appeal, is that he did not state them within the four corners of the *Pitchess* motion. (See *People v. Welch* (1999) 20 Cal.4th 701, 739 ["We review the correctness of the trial court's ruling at the time it was made . . . and not by reference to evidence produced at a later date"]; *People v. Kerley* (2018) 23 Cal.App.5th 513, 557, fn. 16 ["this court may consider only the evidence presented to the trial court when the motion was heard"]; *People v. Hernandez* (1999) 71 Cal.App.4th 417, 425 [defendant "is too late. We may assess the trial court's ruling only on the facts made known to it at the time it made that ruling"].)

In sum, Palacios had an obligation *within the Pitchess motion* to demonstrate a plausible factual scenario. (See *Thompson, supra*, 141 Cal.App.4th at p. 1316.) After our own review of the *Pitchess* motion, we agree with the trial court that he failed to do so.

Thus, we find no abuse of the trial court's discretion and affirm the denial of Palacios's motion for an in camera review of an officer's personnel records. (See *Alford v. Superior Court, supra,* 29 Cal.4th at p. 1039 [a court has broad discretion in ruling on a *Pitchess* motion].)

*E. Cumulative Prejudice*

Palacios contends the cumulative prejudice of the alleged foregoing errors compels reversal of his murder conviction. We disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 728.) However, the rejection of each of a defendant's individual claims "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate." (*In re Reno*, at p. 483.)

Here, we found that the alleged errors claimed by Palacios are not meritorious. Thus, there is no prejudice to cumulate.

## III.

## DISPOSITION

The judgment is affirmed.

MOORE, ACTING P. J.

WE CONCUR:

GOODING, J.

SCOTT, J.

33